## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CIVIL ACTION NO. 5:14-CV-00110-TBR-LLK

DONNA TINDLE, as administrator of the
Estate of Jimmie W. Tindle,                                              Plaintiff,

v.

HUNTER MARINE TRANSPORT, INC.,                                          Defendant.

## MEMORANDUM OPINION AND ORDER

Donna Tindle filed this wrongful death action as the administrator of her late-husband Jimmie W. Tindle's estate. She alleges that Hunter Marine Transport, Inc. unreasonably delayed evacuating Tindle from the *M/V Elizabeth Ann* after he complained of difficulty breathing and so breached its duty to provide prompt and adequate medical care under the Jones Act and general maritime law. With discovery at an end, each side seeks to exclude certain expert opinions offered by the other. Hunter Marine also asks for partial summary judgment as to certain theories on which Mrs. Tindle bases her negligence claims and as to the availability of particular types of damages. Collectively, the Court addresses those motions below.

### I.

### A.

### 1.

In April 2013, at the age of 53, Jimmie W. Tindle sought employment as an engineer with Hunter Marine Transport, Inc. R. 27 at 1 (Response to Motion to Exclude Dr. Varon's Opinions). As part of the application process, Hunter Marine required Tindle to undergo a medical evaluation. R. 21-1 at 2 (Memorandum in Support of

Motion to Exclude Dr. Varon's Opinions).  A physician with HealthWorks Medical, LLC examined Tindle on April 17, 2013.  *See* R. 27-1 at 1 (Report from HealthWorks Medical, LLC).  During that examination, the physician noted that Tindle suffered from asthma.  *Id.* at 1–2.  Based on Tindle's poor spirometry results, HealthWorks Medical deferred clearing Tindle until his treating pulmonologist, Dr. John W. Forman, certified him as fit for duty.  *Id.* at 1–2, 11.  Soon after, Dr. Forman did just that, stating:

> Mr. Tindle has been a patient of mine since 2010 and has been treated for asthma that has been well controlled.  He has rare episodes of exacerbations that are easily managed.  He is on controller medication for his asthma and rarely uses a rescue inhaler.  He travels extensively at sea and we have always been able to manage his asthma without difficulty.
>
> It is my impression that Mr. Tindle is able to work as an engineer on a barge.  If there is any question in this regard, please feel free to contact my office.

*Id.* at 4.  Relying on Dr. Forman's letter, HealthWorks Medical declared Tindle medically fit to work aboard a river towboat, provided he not be assigned to a vessel which required respirator use.  *Id.* at 3.  Subsequently, Hunter Marine hired Tindle.  R. 21-1 at 2.

## 2.

On two occasions during his time with Hunter Marine, Tindle experienced episodes of respiratory distress severe enough to force him to seek shoreside medical treatment.  The first incident occurred on July 4, 2013, when Tindle called his supervisor, Port Engineer Gary Adams, and said that he needed to see a doctor about his asthma immediately.  R. 27-2 at 25 (Adams' Deposition).  Port Engineer Adams relieved Tindle, and Hunter Marine's Safety Manager Jonathan Bennett transported Tindle to Livingston Hospital in Salem, Kentucky.  *Id.* at 25–27.  According to Livingston Hospital's records, Tindle complained of "shortness of breath, respiratory distress, and [a] history of asthma with exacerbation."  R. 27-3 at 2 (Records of Livingston Hospital).  The admitting

2

physician ordered a breathing treatment, including injections and oxygen, and proscribed Tindle a series of medications. *Id.* at 3. Tindle filled the prescriptions at a local pharmacy, and then returned to the vessel that afternoon. R. 27-2 at 28–29.

The second episode transpired on August 24, 2013. *Id.* at 13, 24. Again, Tindle called Port Engineer Adams and complained of shortness of breath and trouble breathing. *Id.* As before, Port Engineer Adams arranged for Tindle to be transported from the vessel to Dallas Medical PLLC in Paducah, Kentucky. *Id.* The admitting physician ordered a breathing regimen and proscribed Tindle another series of medications. R. 27-4 at 1–4 (Records of Dallas Medical PLLC). Tindle filled those prescriptions and returned to the vessel later that day too. R. 27-2 at 15, 24.

### 3.

The circumstances behind the tragic incident aboard the *M/V Elizabeth Ann*—and those at the core of this lawsuit—begin on April 24, 2014. Sometime between 9:00 a.m. and 11:00 a.m., Tindle spoke with Captain Billy Milam about pollen "aggravating his asthma." R. 27-7 at 19, 32 (Milam's Deposition). Before that conversation, Captain Milam was unaware that Tindle suffered from asthma: No one from Hunter Marine had told Captain Milam about the two prior episodes where Tindle had to be evacuated from the vessel. *See id.* at 19, 92–93. But according to Milam, Tindle "looked fine" on the morning of April 24, and neither spoke about him departing the vessel that day. *See id.* at 32–33, 35.

The following morning, Tindle talked with vessel cook Maggie Just during breakfast. R. 21-7 at 13 (Just's Deposition). Just thought that Tindle "looked tired and just like he didn't feel well," *id.*, and Tindle told her that "he thought his asthma was

acting up," *id.* at 14.  Tindle left with a cup of coffee, but returned to the galley sometime

later, and told Just that "he was feeling worse."  *Id.* at 15.  Just agreed that Tindle looked

worse for wear, and she told Tindle that when Kaleb Kline boarded the vessel, he should

go.  *Id.*  But Tindle said that he wanted to "ride with Kaleb for a little while so he would

get off at Kentucky Dam," a destination roughly twelve hours away.  *Id.* at 15–16.

In addition to speaking with Just, Tindle called Dr. Foreman's office sometime

during the morning of April 25 and requested medication for his breathing problems.  *See*

R. 21-8 at 1 (Records of Pulmonary Medicine Center of Chattanooga).  According to Dr.

Forman's records, Tindle said that he "[would] be coming ashore this weekend, needs

something called in, [and couldn't] afford not to work."  *Id.*  Dr. Foreman proscribed a

Prednisone regimen.  *Id.*

At around 10:30 a.m., Tindle approached Captain Milam as he had the day before.

R. 27-7 at 36.  Tindle told Captain Milam that his asthma was "acting up and [that] he

had run out of medicine," but that he would retrieve more when the *M/V Elizabeth Ann*

arrived at Kentucky Lock.  *Id.* at 37.  Captain Milam asked Tindle if he wanted to leave

the vessel; Tindle's response is not entirely clear, *see id.* at 36–41, and is contested,

*compare* R. 21-1 at 3, *with* R. 27 at 4 & n.1.  In addition, Tindle discussed the possibility

of calling his supervisor, Port Engineer Adams.  R. 27-7 at 35–37.  Perhaps Captain

Milam put it best when he testified that "[Tindle] didn't sound certain about what he was

going to do."  *Id.* at 36–37.  In any event, Captain Milam described Tindle as looking

"fine," but "a little more tired that day" than usual.  *Id.* at 42.

While the record is not forthcoming about how Safety Manager Bennett learned

of Tindle's breathing issues, *see* R. 27-2 at 41–42, sometime between 9:00 a.m. and

10:00 a.m. that same morning, Safety Manager Bennett spoke with Port Engineer Adams about Tindle's condition, *id.* at 40–41.   Port Engineer Adams suggested that it might be necessary to take Tindle off of the vessel.   *Id.* at 40.   Shortly after speaking with Safety Manager Bennett, Port Engineer Adams called Ronnie Cato to see if he might be able to relieve Tindle, but Cato declined because of other obligations.   *Id.* at 42–44.   Port Engineer Adams' subsequent efforts to find an engineer to relieve Tindle proved fruitless. *Id.* at 44.

Apparently, Tindle also called Cato between 12:00 p.m. and 1:00 p.m. that afternoon.   R. 21-10 at 8 (Cato's Deposition).   According to Cato's testimony, "[Tindle] was having some trouble breathing, but it was no big issue.   I mean, he didn't act like he was in distress or anything."   *Id.* at 8–9.   Tindle asked if Cato might be able to come and relieve him, *id.* at 8, but Cato declined because of family obligations, *id.* at 9.   Cato suggested that Tindle contact Port Engineer Adams, and the conversation ended.   *Id.* at 12.

Tindle's wife called Hunter Marine around 3:35 p.m. that afternoon and spoke with Safety Manager Bennett.   R. 21-9 at 34 (Bennett's Deposition).   Mrs. Tindle asked him to retrieve some medication called in for her husband because he "was having some breathing difficulties."   *Id.*   According to Safety Manager Bennett, she "was adamant that it was just medication that [Tindle] needed, and he did not want to get off the boat."   *Id.* at 35.   Safety Manager Bennett assured Mrs. Tindle that he would bring the medication to her husband.   *Id.*

Later that afternoon at 4:07 p.m., Tindle called deckhand Kaleb "Tiny" Kline.   R. 21-11 at 9–11 (Kline's Deposition).   Sounding distressed, Tindle said: "Tiny,

something's wrong.  Come up here." *Id.* at 11–12 (internal quotation marks omitted). Along with fellow deckhand Jonathan Welker, Kline went straight to Tindle's room. *Id.* at 12.  The pair found Tindle "standing at his window breathing heavily." *Id.* at 12–13. Kline told Welker "to go alert the wheelhouse." *Id.* at 13.  Kline then stood behind or to the side of Tindle while Tindle explained how to administer an EpiPen should he lose consciousness. *Id.* at 14–15.  After a few minutes, Tindle passed out in Kline's arms. *Id.* at 15.  Meanwhile, another deckhand woke Captain Milam and "told him that [Tindle] needed his help"; Captain Milam rushed to Tindle's room.  R. 21-6 at 45 (Milam's Deposition).

Captain Milam found Tindle unconscious with Kline tending to him. *Id.* at 46. According to Captain Milam, Tindle had a pulse. *Id.* at 47.  Within a few short moments, Welker returned along with crewmember Ben Vernon. *Id.* at 48.  Either Kline or Captain Milam instructed Welker or Vernon to get an Automated External Defibrillator. *Compare id.* at 45, *with* R. 21-11 at 16–17.  As Captain Milam left to call 911, he passed a crewmember carrying an AED to Tindle's room.  R. 21-6 at 48.  The crew removed Tindle's shirt and attempted to connect the AED to Tindle.  R. 21-11 at 17–18.  Kline testified that, just prior to this point, Tindle was gasping for breath but still breathing. *Id.* at 18.  When the AED was connected, however, Tindle had stopped breathing, and so Kline and Vernon began attempting cardiopulmonary resuscitation. *Id.* at 19–20.

Captain Milam placed his call to the Trigg County Emergency Medical Services Department at 4:13 p.m., R. 21-12 at 8 (Mayfield's Deposition), and then instructed Robert Patterson to maneuver the *M/V Elizabeth Ann* to a nearby boat ramp at Linton, Kentucky, R. 21-7 at 48.  Dispatch alerted Emergency Medical Technicians Emily

Mayfield and Tim McGar, who were approximately nineteen miles away, at 4:15 p.m.  R. 21-12 at 8–9.  While en route, dispatch notified Mayfield and McGar that Tindle would be brought to the ramp via johnboat.  *Id.* at 9.  Mayfield and McGar arrived at the ramp at 4:35 p.m., but no one from the *M/V Elizabeth Ann* had yet landed.  *Id.* at 10.  Mayfield notified dispatch, and dispatch again told them "that someone would be bringing the patient on a boat."  *Id.*  Shortly after, the johnboat arrived, but Tindle wasn't aboard.  *Id.*

All told, it took thirteen minutes for Mayfield and McGar to load the necessary equipment on the johnboat and reach Tindle aboard the *M/V Elizabeth Ann*.  R. 27-11 at 11 (Mayfield's Deposition).  Sometime during that thirteen minute period, the crew of the *M/V Elizabeth Ann* radioed the johnboat and indicated that Kline and Vernon had started to attempt cardiopulmonary resuscitation.  *Id.* at 13–14.  Mayfield and McGar boarded the *M/V Elizabeth Ann* and began lifesaving efforts at 4:48 p.m.  *See id.* at 11, 17–21. Tragically, neither was able to ever detect a pulse.  *Id.* at 18.  Both ceased all lifesaving efforts at 5:16 p.m.  *Id.* at 21.

## B.

On June 2, 2014, Donna Tindle filed this wrongful death action as the administrator of Tindle's estate asserting claims under the Jones Act and general maritime law.  *See* R. 1 at 2, ¶ 3 (Complaint).  Mrs. Tindle alleges that Hunter Marine Transport, Inc. unreasonably delayed evacuating her husband from the *M/V Elizabeth Ann*, breaching its duty to provide prompt and adequate medical care.  *Id.*, ¶ 5.  She seeks to recover damages for Tindle's pain and suffering prior to death, for loss of Tindle's earnings and earning capacity, support, inheritance, guidance, and society, as well as punitive damages.  *Id.*, ¶¶ 6–7.

## II.

Both Mrs. Tindle and Hunter Marine move to exclude various expert opinions offered in this case. For her part, Mrs. Tindle seeks to strike certain opinions offered by Hunter Marine's liability expert, Captain William M. Beacom. R. 20 at 1 (Motion to Exclude Captain Beacom's Opinions). In response, Hunter Marine asks to exclude certain opinions offered by Mrs. Tindle's medical expert, Dr. Joseph Varon, and by her liability expert, Captain James P. "Pat" Jamison. R. 21 at 1 (Motion to Exclude Dr. Varon's Opinions); R. 23 at 1 (Motion to Exclude Captain Jamison's Opinions). The Court will discuss each motion in turn.

## A.

When a party challenges an opponent's expert witness, this Court must assume "a gatekeeping role" to ensure the reliability and relevance of the expert's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to nonscientific expert testimony). Federal Rule of Evidence 702 guides the Court through this inquiry. The plain language of Rule 702 says, first, that an expert must be qualified to testify on account of his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015). The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). A qualified expert may then testify so long as his opinions will aid the factfinder and are reliable, meaning the opinions are based on

sufficient data, reliable methods, and the facts of the case.  Fed. R. Evid. 702(a)–(d); *see also Clark v. W & M Kraft, Inc.*, 476 F. App'x 612, 616 (6th Cir. 2012); *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 854 (E.D. Ky. 2013).

There are a number of factors typically considered to resolve questions concerning the reliability (and admissibility) of expert testimony, but no list is exhaustive.  *See Daubert*, 509 U.S. at 593–94; *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Powell v. Tosh*, 942 F. Supp. 2d 678, 686–88 (W.D. Ky. 2013).  In any case, the Court has considerable leeway over where to draw the line.  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) ("[W]here one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997))).  The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

**B.**

Hunter Marine moves to exclude various opinions offered by Mrs. Tindle's medical expert, Dr. Joseph Varon.  R. 21 at 1.  Regrettably, Hunter Marine has not excerpted from Dr. Varon's single-spaced, seven-page report those particular passages to which it objects—an omission which, while unintentional, still complicates the Court's task.  *See* R. 27 at 8 ("It is difficult to ascertain the specific opinion of Dr. Varon that [Hunter Marine] challenges . . . since it is not excerpted or identified with particularity.").  But Hunter Marine does paraphrase the challenged opinions in the following way:

[1] Hunter should have trained the crewmembers aboard the [*M/V Elizabeth Ann*] on the hallmark symptoms, risks, and appropriate treatment protocol for someone suffering from asthma such as Mr. Tindle.

[2] Hunter should have had a plan for emergent care and first aid for an asthma attack.

[3] Mr. Tindle should have been taken off the vessel sooner to receive medical attention for his acute asthma attack.

R. 21-1 at 5–6.  In the following subparts, the Court will reproduce the testimony that Hunter Marine ostensibly considers objectionable, and then will address the merits of those objections.

## 1.

Hunter Marine first moves to exclude Dr. Varon's opinion that:

The crew members aboard the M/V ELIZABETH ANN, and in particular, Captain Milam, should have been trained on the hallmark symptoms, risks, and appropriate treatment protocol for someone suffering from asthma such as Mr. Tindle who works aboard a river tow boat which often has limited access to prompt emergency medical assistance.

R. 21-2 at 5–6 (Dr. Varon's Report); *see also* R. 21-1 at 5.  Neither party disputes Dr. Varon's qualifications to offer medical opinions in this case.  *See* R. 21-1 at 7; R. 36 at 2 (Reply in Support of Motion to Exclude Dr. Varon's Opinions).  But whatever Dr. Varon's qualifications on that score, Hunter Marine says, he sorely lacks the credentials necessary to opine about the proper protocol for "operating vessels, training vessel crewmembers, or developing emergent care plans for river towboats."  R. 21-1 at 6. Opinions on *those* matters should be left to a maritime expert—something, Dr. Varon concedes, he isn't.  *See id.* at 6–7; R. 21-14 at 68 (Dr. Varon's Deposition).

The Court agrees.  While Mrs. Tindle resists this conclusion, her objections are of no moment.  Certainly, Dr. Varon's opinion might be "made in the context of Tindle's prior history of asthma attacks and what was done to treat them."  R. 27 at 9.  But just

because many of Dr. Varon's premises involve his medical expertise does not mean his ultimate conclusion does too.  Instead, Dr. Varon's opinion seeks to articulate (accurately or not) the standard of care to which the law holds a reasonably prudent maritime outfit.  Of course, such an opinion is not a medical opinion.  Consequently, the Court finds Dr. Varon to be unqualified to offer expert testimony on that subject.

### 2.

Next, Hunter Marine opposes Dr. Varon's estimation that:

> [1] A plan for emergent care and first aid for an asthma attack such as assisting with sitting upright, assisting with administration of prescribed inhalers/nebulizers, providing oxygen, and administering emergency medications such as Epinephrine and steroids should have also been implemented . . . . [2] Mr. Tindle could have, and should have, been taken off the vessel to receive medical attention for his acute asthma attack on the morning of April 24, 2014 when he reported his symptoms to Captain Milam while the vessel was stationed at Cumberland City . . . .

R. 21-2 at 6; *see also* R. 21-1 at 7–9; R. 36 at 3.  According to Hunter Marine, Dr. Varon's opinion is objectionable because it seeks to impose extralegal obligations on a maritime employer "to monitor and evaluate the health of crewmembers."  R. 21-1 at 7; *see also* R. 36 at 3.  Mrs. Tindle responds that Dr. Varon's opinions are properly directed at what the crewmembers aboard the *M/V Elizabeth Ann* "should have done when confronted with [Tindle's] acute asthma attack"—and not at what should have been done to monitor or evaluate Tindle's condition generally.  R. 27 at 11.

### a.

While Hunter Marine's characterization of Dr. Varon's opinion perhaps goes a bit too far, the Court does agree with its ultimate conclusion.  To be sure, many of Dr. Varon's statements fall within his area of expertise as a medical doctor.  In other circumstances, much what Dr. Varon has to say might be the subject of expert testimony.

11

Dr. Varon's discussion regarding the administration of "emergency medications such as Epinephrine and steroids" would be appropriate, for example, if offered to show how an acute asthma episode is treated in a clinical setting.  R. 21-2 at 6.  But Dr. Varon's testimony appears to go much further than just saying that.

Again, Dr. Varon's testimony seeks to articulate (accurately or not) the standard of care to which the law holds a maritime transportation outfit.  On that subject, Dr. Varon has no special experience or professional knowledge.  *Cf. Champ v. Marquette Transp. Co.*, No. 5:12-CV-00084-TBR, 2014 WL 2879152, at *10 (W.D. Ky. June 24, 2014) (finding maritime captain qualified to offer "an expert opinion as to the appropriateness of [a captain's] response to [a crewmember's] request for medical treatment" based "on his professional experience and knowledge of the standards applicable to maritime transportation companies").  The Court finds Dr. Varon to be unqualified to offer an expert testimony on Hunter Marine's obligation (or non-obligation) to develop and implement a plan for emergent care and first aid related to Tindle's asthma.

### b.

Also objectionable is Dr. Varon's statement that Tindle "*could have*, and should have, been taken off the vessel to receive medical attention . . . on the morning of April 24."  R. 21-2 at 6 (emphasis added).  Dr. Varon may opine as to the *consequences* of the delay (if any) in obtaining treatment for Tindle's condition.  *See Champ*, 2014 WL 2879152, at *7 ("Dr. Varon is qualified to offer an opinion whether Champ likely would have survived had he received medical treatment sooner.").  But the *feasibility* of removing Tindle from the *M/V Elizabeth Ann* sooner is not part of Dr. Varon's field of

expertise.  *Cf. id.* at *6 ("[Dr. Varon] in fact concedes that he is not a maritime expert and has no familiarity with . . . the facilities near the [vessel's] location, or the difficulties attendant to obtaining medical care for a person aboard a river vessel.").  Therefore, the Court finds that Dr. Varon is unqualified to offer expert testimony on that subject too.

**3.**

In addition, Hunter Marine challenges Dr. Varon's testimony that:

> had Mr. Tindle been transported to the Linton Boat Ramp in the small john boat as had previously been indicated to the EMS dispatcher, EMT's [sic] Emily Mayfield and Tim McGar could have begun working on him immediately including establishing an IV, administering Epinephrine, establishing an airway and performing CPR.  It is my opinion that had this occurred, Mr. Tindle more likely than not would have survived his asthma attack.

R. 21-2 at 6; *see also* R. 21-1 at 10–11; R. 36 at 5–6.  As Hunter Marine sees it, Dr. Varon cannot opine reliably about the probability of Tindle surviving had the crew brought him ashore instead of bringing Mayfield and McGar aboard the *M/V Elizabeth Ann*.  R. 21-1 at 10–11.  Hunter Marine hinges its objection on the assertion that Dr. Varon lacks an "evidentiary basis to testify about how much time, if any, could have been saved" by carrying Tindle to shore in the johnboat since he is not a maritime expert.  *Id.* at 10.

Hunter Marine's objection is spurious at best.  "Dr. Varon is qualified to offer an opinion" about Tindle's chance at surviving "had he received medical treatment sooner," *Champ*, 2014 WL 2879152, at *7, especially since Tindle was still breathing when Mayfield and McGar arrived at the Linton boat ramp, *see* R. 27-11 at 13–14.  The fact "that Dr. Varon is unfamiliar with river vessels, generally, and with the practical specifics of maritime operations [goes] more appropriately to the weight of his testimony," not the reliability of his medical opinion.  *Champ*, 2014 WL 2879152, at *7.  Any further

13

argument on this point is best reserved for cross-examination, just as this Court made clear in *Champ*.  The Court finds no reason to exclude Dr. Varon's opinion on this issue.

### C.

For her part, Mrs. Tindle moves to exclude various opinions offered by Hunter Marine's liability expert, Captain William M. Beacom.  R. 20 at 1.

### 1.

To start, Mrs. Tindle objects to Captain Beacom's opinion (and its "factual" basis) that:

> Tindle had a much better understanding of his condition than any other crew member on the M/V Elizabeth Ann. . . . [Tindle did not] take[] his condition seriously . . . . [Tindle] knew his symptoms and potential problems better than any other person.

R. 20-2 at 3 (Captain Beacom's Report); *see also* R. 20-1 at 3–4 (Memorandum in Support of Motion to Exclude Captain Beacom's Opinions).  Mrs. Tindle asserts that Captain Beacom "is not competent to offer opinions concerning [her husband's] state of mind," but that even if he were, his "opinions are nothing more than pure speculation and conjecture."  R. 20-1 at 4.  Hunter Marine does not appear to contest either point.  *See* R. 31 at 4–5 (Response to Motion to Exclude Captain Beacom's Opinions).  But even if it did, such an effort would be unavailing.

Generally speaking, an expert witness cannot opine on a person's state of mind. *See, e.g.*, *Powell*, 942 F. Supp. 2d at 703.  The rationale for that exclusion is sound: Because an expert witness has no firsthand knowledge about which to testify, he is capable only of drawing inferences from the evidence and determining "what, to his mind, is the most likely explanation for the events."  *Waite, Schneider, Bayless & Chesley Co. v. Davis*, ⸺ F. Supp. 3d ⸺, ⸺, 2015 WL 3505793, at *14 (S.D. Ohio

14

2015).   The task of drawing such inferences, however, is one solely within the competence of the jury.  *CMI-Trading, Inc. v. Quantum Air, Inc.*, 98 F.3d 887, 890 (6th Cir. 1996), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998).  To allow expert testimony on a person's state of mind, then, merely invites the jury to substitute the expert's judgment for its own.

Consequently, Captain Beacom cannot opine that Tindle "knew his symptoms and potential problems better than any other person."  R. 20-2 at 3; *see MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio 2013) ("Berman's opinion that Brock *knew* Korpan used proprietary information is obviously an evaluation of Brock's state of mind.").  Said differently, Captain Beacom cannot make conclusory statements regarding Tindle's actual state of mind.  Therefore, the Court will exclude Captain Beacom's testimony on those points.

## 2.

In addition, Mrs. Tindle challenges Captain Beacom's testimony that:

> had [her husband] taken his condition seriously and had an adequate supply of prescribed medications, this attack might not have occurred. Tindle also appears to have aggravated his asthma and allergy conditions by fishing outside the boat while they were tied off at Cumberland City during a time when pollen and allergy conditions were unusually severe. . . . The cavalier attitude exhibited by both Jimmie Tindle and his wife regarding his asthma was the sole cause of his death.

R. 20-2 at 3–4; *see also* R. 20-1 at 4–5.  According to Mrs. Tindle, Captain Beacom is a maritime expert; he is not a medical expert and is unqualified to opine on "asthma, its causes, prevention and treatment."  R. 20-1 at 6.  Hunter Marine concedes that it will not "elicit opinions from Captain Beacom about medical issues related to what triggered [Tindle's] asthma attack or [caused] his death."  R. 31 at 4–5.  But it maintains that Captain Beacom should still be allowed to testify about how Tindle's decision to expose

15

himself to pollen, as well as his failure to bring a sufficient quantity of medication, amounts to negligence. *See id.* at 4.

The Court sees some merit to Hunter Marine's argument. For example, Captain Beacom could be qualified, based "on his professional experience and knowledge of the standards applicable to maritime transportation companies," to express an opinion about how brown-water mariners typically handle chronic medical conditions while aboard a vessel such as the *M/V Elizabeth Ann*. *Cf. Champ*, 2014 WL 2879152, at *10 (allowing a maritime expert to express an opinion "as to the appropriateness of [a maritime company's] response to [a crewmember's] request for medical treatment"). But Captain Beacom's report does not do that—at least, not with sufficient clarity. Instead, each matter excerpted above involves, principally, medical conclusions about which Captain Beacom is unqualified to testify. *See id.* (excluding maritime expert's testimony that "earlier medical attention would have most likely saved [a crewmember's] life" (internal quotation marks omitted)). Consequently, the Court will exclude Captain Beacom's speculative opinions on this subject.[1]

### 3.

While somewhat perfunctorily, Mrs. Tindle also takes issue with Captain Beacom's conclusion that "the crew of the M/V Elizabeth Ann . . . did everything possible to save [her husband's] life." R. 20-2 at 4; *see also* R. 20-1 at 5. She appears to suggest that this statement is an "impermissible factual conclusion[] . . . outside of Captain Beacom's professed area of expertise." R. 20-1 at 5. In response, Hunter Marine says that as "an experienced towboat captain, Captain Beacom should be permitted to

---

[1] Of courses, if Captain Beacom has personal knowledge, then he may testify as to Tindle's activities on April 24 and to the quantity of medication that Tindle brought with him. He simply may not express his opinion on the medical consequences, if any, related to those factual maters.

16

opine about the facts and reasons that support the reasonable response by Captain Milam and other Hunter Marine crewmembers to Tindle's medical condition." R. 31 at 3.

The Court agrees with Hunter Marine in part.  Based on his professional experience and knowledge of the standards followed in the maritime industry, the Court is satisfied that Captain Beacom is qualified to express his opinion as to the use "of discretion and professional judgment in handling" Tindle's medical emergency.  *Champ*, 2014 WL 2879152, at *10.  He may be able to testify that the crew of the *M/V Elizabeth Ann* followed every industry standard in addressing Tindle's condition.  He may not speculate, however, that Hunter Marine did everything possible to save Tindle's life.  That, again, is a medical conclusion about which Captain Beacom is unqualified to testify, and the Court will limit his testimony accordingly.  *See id.*

## D.

Finally, Hunter Marine moves to exclude various opinions offered by Mrs. Tindle's liability expert, Captain James P. "Pat" Jamison.  R. 23 at 1.

## 1.

First, Hunter Marine objects to Captain Jamison's testimony that:

> It is my opinion that a significant amount of valuable time was lost as the deck crew of the M/V ELIZABETH ANN took a jon boat to the landing at Linton, KY located approximately at Mile 73 on the Cumberland River without Jimmie Tindle, loaded up the EMT's [sic] and their equipment, and the motored back to the M/V ELIZABETH ANN so they could work on him.  Captain Milam and the crew knew that Mr. Tindle was unconscious and in need of emergency medical attention.  They should have put him in a Stokes basket and delivered him in the jon boat to the EMT's [sic] at the boat ramp.

R. 23-2 at 4, ¶ 7 (Captain Jamison's Report); *see also* R. 23-1 at 2 (Memorandum in Support of Motion to Exclude Captain Jamison's Opinions).  As Hunter Marine sees it, Captain Jamison is a maritime expert, not a medical expert, so his lack of "expertise in

emergency medicine" means that he cannot "determine whether any delay was 'significant.'" R. 23-1 at 3. Hunter Marine cites to this Court's opinion in *Champ*, which excluded testimony from a maritime expert who offered to opine that a "delay in treatment cost [the decedent] his life" because the witness had "no medical expertise." 2014 WL 2879152, at *10 (internal quotation marks omitted).

On the other hand, Mrs. Tindle characterizes Captain Jamison's opinion as speaking "to Captain Milam's failure to act as a reasonable and prudent riverboat captain when presented with the situation of an unconscious crewmember in need of immediate emergency medical treatment"—not as offering any medical judgment. R. 28 at 3 (Response in Opposition to Motion to Exclude Captain Jamison's Opinions). Accordingly, she maintains that, as a riverboat captain, Captain Jamison is "qualified to opine that valuable time could have been saved by putting . . . [her husband] in a Stokes basket and delivering him via jon boat to the [EMTs] who were waiting at the boat ramp." *Id.* Mrs. Tindle also relies on *Champ*, in which the Court allowed a maritime expert to testify that the riverboat captain "should have immediately launched the jon boat . . . so that [the decedent] would have been transported to a hospital as quickly as possible." 2014 WL 2879152, at *10 (internal quotation marks omitted).

On this point, Mrs. Tindle has the better argument. As a maritime expert, Captain Jamison is qualified "to express an opinion as to Captain [Milam's] use of discretion and professional judgment in handling [Tindle's] emergency." *Id.* Based on Captain Jamison's professional experience and knowledge of maritime transportation outfits, he is qualified to opine that a "significant" amount of time was lost when the crew of the *M/V Elizabeth Ann* decided to transport Mayfield and McGar to Tindle instead of transporting

Tindle to Mayfield and McGar. Provided that the word "significant" relates to the *quantity* of (as opposed to the implications from) lost time, Captain Jamison's testimony is unobjectionable. However, he may not testify as to whether this lost time was medically consequential.

### 2.

Next, Hunter Marine takes issue with Captain Jamison's opinion that:

> It is not surprising that Mr. Jimmie Tindle stated his desire to remain onboard the vessel. He is paid a substantial daily rate of pay which would stop if he were to get off the vessel.

R. 23-2 at 4, ¶ 6; *see also* R. 23-1 at 2. Hunter Marine asserts that Captain Jamison's testimony "concerns Tindle's state-of-mind and choices . . . [and] is impermissible speculation." R. 23-1 at 5. But Mrs. Tindle says that Captain Jamison is only "offering an opinion concerning the well-known reluctance of crewmembers to leave the vessel due to illness" and why "a reasonable and prudent river boat captain" should take that into account before deciding not to evacuate a crewmember. R. 28 at 6.

While a close call, the Court agrees with Hunter Marine. Assuming he is qualified to do so, Captain Jamison could likely testify about relevant, customary industry practices. *See Johnson v. Cenac Towing Inc.*, No. CIV.A.06-0914, 2006 WL 5499506, at *3 (E.D. La. Nov. 21, 2006). But Captain Jamison appears to go slightly further, speculating about why Tindle decided to remain on the vessel. Because drawing such inferences properly belongs to the jury, Captain Jamison's testimony is excluded to the extent it references (albeit it subtly) Tindle's state of mind.

### 3.

Lastly, Hunter Marine objects to the following testimony of Captain Jamison:

> Hunter Marine Transport, Inc. has a policy in place where the deckhands will check on the captain or pilot on watch every two (2) hours as the person on watch in the wheelhouse is alone and could need a quick relief from his post for a few minutes.   This is stated in the Safety Meeting Records in this file.   It is my opinion that on this southbound trip, after making the unwise decision to leave Cumberland City located at Mile 103 of the Cumberland River at 11:50 AM on April 25, 2014, Captain Milam, at a minimum, should have set up the same policy to check on a fellow crew member Mr. Jimmie Tindle who had made multiple complaints about his asthma, was considering calling for a relief, and was at that time known to be without his medicine.
>
> . . . .
>
> Safety Manager Jonathan Bennett and Port Engineer Gary Adams should have required further medical evaluation of Mr. Tindle's asthma and should have informed Captain Milam about his prior asthma attacks requiring him to leave the vessel for medical attention.

R. 23-2 at 3, 5, ¶¶ 4, 9; *see also* R. 23-1 at 2.   In essence, Captain Jamison's opinions seek to answer the question of what a prudent maritime transportation company, such as Hunter Marine, should do when faced with a crewmember complaining of asthma-related symptoms.   Captain Jamison is free to offer his opinion as to the standard of care Hunter Marine should have followed, *see Taylor v. TECO Barge Line, Inc.*, 642 F. Supp. 2d 689, 694 (W.D. Ky. 2009), and Hunter Marine's objection to the contrary is of no moment.

## III.

Hunter Marine also moves for partial summary judgment as to certain theories on which Mrs. Tindle bases her negligence claims and as to the availability of particular types of damages.   R. 19 at 1 (Motion for Partial Summary Judgment on Damages); R. 22 at 1 (Motion for Partial Summary Judgment on Liability).   Mrs. Tindle has responded to both, conceding the former and opposing portions of the latter.   *See* R. 30 at 1 (Response to Motion for Partial Summary Judgment on Damages); R. 29 at 1 (Response to Motion

for Partial Summary Judgment on Liability).  The Court discusses the respective merits of these motions below.

## A.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, Hunter Marine must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Mrs. Tindle's claims.  Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming Hunter Marine satisfies its burden of production, Mrs. Tindle "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

21

**B.**

The Jones Act embodies a "policy of providing an expansive remedy for seamen who are injured while acting in the course of their employment." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 382–83 (6th Cir. 2008) (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001)) (internal quotation marks omitted).  In pertinent part, it provides a cause of action in negligence for any seaman injured in the course of his employment.  *See* 46 U.S.C. § 30104; *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995).  "'Proof of negligence (duty and breach) is essential to recovery under the Jones Act,' and an employer's conduct in a Jones Act case is reviewed 'under the "ordinary prudence" standard normally applicable in negligence cases.'"  *Rannals*, 265 F.3d at 447 (quoting *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001)).  If the seaman is able to establish that the employer acted negligently, then he need only show that the "employer's negligence 'played any part, even the slightest, in producing the injury or death for which damages are sought.'"  *Id.* at 447–48 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)).  "The obligation of a shipowner to his seamen is substantially greater than that of an ordinary employer to his employees."  *Interocean S.S. Co. v. Topolofsky*, 165 F.2d 783, 784 (6th Cir. 1948) (per curiam) (citing *Koehler v. Presque-Isle Transp. Co.*, 141 F.2d 490, 492 (2d Cir. 1944)).

**1.**

Hunter Marine argues that the Jones Act imposed no duty on it to monitor or evaluate Tindle's asthma condition.  *See* R. 22-1 at 1–2 (Memorandum in Support of Motion for Partial Summary Judgment on Liability).  In support of that proposition, it relies heavily on *Champ*, in which this Court held "that the Jones Act imposes no duty on

22

a maritime employer to monitor or evaluate an employee's health." 2014 WL 2879152, at *24. As best the Court can tell, Hunter Marine reads that statement as absolving it of a duty to monitor or evaluate Tindle's status not only before, but also after, he reported symptoms to Captain Milam indicative, perhaps, of an acute asthma attack. *See* R. 22-1 at 1–2; R. 34 at 2 (Reply in Support of Motion for Partial Summary Judgment on Liability).

### a.

On this nuanced point, Hunter Marine is only half right. That is, Hunter Marine had no duty to monitor or evaluate Tindle's asthma on a *preventative* basis. As *Champ* made clear, the Jones Act does not impose a "duty on an employer to perform periodic physical examinations of its employees." 2014 WL 2879152, at *24 (discussing *Fulk v Ill. Cent. R.R. Co.*, 22 F.3d 120, 125 (7th Cir. 1994)). As to any theory premised on a failure to monitor or evaluate Tindle's condition on a preventative basis, then, Hunter Marine is entitled to judgment as a matter of law.

### b.

However, the above-recited passage in *Champ* does not speak to the separate issue of what aid Hunter Marine should furnish Tindle once he started displaying signs of respiratory distress. The latter situation implicates Hunter Marine's duty as a shipowner "to provide prompt and adequate medical care to a sick or injured crewman." *Olsen v. Am. S.S. Co.*, 176 F.3d 891, 895 (6th Cir. 1999) (citing *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1533 (11th Cir. 1990); *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir. 1986); *Joyce v. Atl. Richfield Co.*, 651 F.2d 676, 685 (10th Cir. 1981); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 679 (2d Cir. 1971)). The scope

23

of that duty "depends upon the circumstances of each case—the seriousness of the injury or illness and the availability of aid." *De Zon v. Am. President Lines*, 318 U.S. 660, 667–68 (1943).

#### i.

On this point, Hunter Marine argues there is insufficient evidence that it breached its duty to provide Tindle with prompt and proper medical treatment. *See* R. 22 at 1. The essence of Hunter Marine's argument appears to be that Captain Milam acted reasonably because Tindle "never once requested to leave the vessel." R. 34 at 3; *see also* R. 22-1 at 3–4 ("[T]he undisputed evidence here is that Tindle never requested to get off the vessel. While that opportunity was offered or suggested to him on multiple occasions, the evidence is undisputed that he repeatedly rejected the opportunity to get off the boat."). In the absence of such a request, Hunter Marine seems to suggest that it had no duty to secure Tindle immediate medical attention. *See* R. 34 at 4–5. Viewing the record in the light most favorable to Mrs. Tindle, however, the Court is not so sure.

Contrary to Hunter Marine's suggestion, the allegation that Tindle never asked to disembark the *M/V Elizabeth Ann* is not dispositive. The law imposes a duty on the shipowner to provide medical care without regard to whether the crewmember "make[s] a distinct request" for such aid. *The Iroquois*, 194 U.S. 240, 247 (1904); *accord Billiot v. Two C's Marine, L.L.C.*, Civil Action No. 10-3046, 2011 WL 2937237, at *4 (E.D. La. July 19, 2011) ("That Carrier asked if Billiot wanted an ambulance and that Billiot declined did not relieve Carrier of his obligation to ensure [Billiot] was treated promptly." (citing *The Iroquois*, 194 U.S. at 247)); *Van Mill v. Bay Data, Inc.*, 819 So. 2d 963, 966 (Fla. Dist. Ct. App. 2002) ("[A] captain or shipowner is required by law to

[e]nsure the well[-]being of a crew member whether or not the crew member requests such aid."). Regardless, there is a genuine dispute of material fact regarding whether Tindle insisted on staying aboard the *M/V Elizabeth Ann*. *Compare* R. 21-1 at 3, *with* R. 27 at 4 & n.1. For example, Captain Milam testified that "[Tindle] didn't sound certain about what he was going to do." R. 27-7 at 36–37. Tindle also discussed the possibility of calling his supervisor, Port Engineer Adams, in order to be relieved. *See id.* at 35–37. Hunter Marine's allegation "that Tindle never requested to get off the vessel" is far from undisputed. R. 22-1 at 3.

### ii.

Moreover, several questions regarding Hunter Marine's alleged negligence raise genuine issues of material fact which precludes summary judgment on Mrs. Tindle's claim. Issues of negligence are "ordinarily not susceptible [to] summary adjudication, but should be resolved by trial in the ordinary manner." *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes S.S. Div.*, 891 F.2d 1199, 1205 (6th Cir. 1989) (quoting *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965)) (internal quotation marks omitted). "[S]ubmission of Jones Act claims to a jury requires a very low evidentiary threshold; even marginal claims are properly left for jury determination." *Id.* (quoting *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978)) (internal quotation marks omitted).

Resolving all ambiguities and drawing all reasonable inferences in her favor, Mrs. Tindle has adduced sufficient evidence such that, if proven, a reasonable jury could find for her. *Cf. Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1254 (11th Cir. 2014). For example, on two occasions during his time with Hunter Marine, Tindle

experienced episodes of respiratory distress severe enough to force him to seek shoreside medical treatment.  Yet no one from Hunter Marine told Captain Milam about these two prior incidents.  *See* R. 27-7 at 19, 92–93.  A reasonable jury might conclude that a prudent shipowner should have advised Captain Milam about Tindle's past asthmatic episodes—particularly so since Captain Milam was responsible for judging whether a crewmember required immediate medical treatment.  In addition, Tindle spoke with Captain Milam about pollen "aggravating his asthma," *id.* at 19, 32, and that his asthma was "acting up and [that] he had run out of medicine," *id.* at 37.  Even though Captain Milam described Tindle as looking "a little more tired that day" than usual, *id.* at 42, he made no effort to obtain medical care for Tindle.  A reasonable jury might find that, in the exercise of ordinary and reasonable care, Captain Milam should have obtained immediate medical treatment for Tindle.  *Cf. Mroz v. Dravo Corp.*, 293 F. Supp. 499, 504 (W.D. Pa. 1968) (holding that jury could infer negligence where captain knew of seaman's emphysema and shortness of breath but allowed her to work in area permeated with diesel fumes).  In short, there is a factual dispute and enough evidence such that a reasonable jury could find in Mrs. Tindle's favor.

## 2.

Hunter Marine also seeks summary judgment as to any theory of liability based on negligent assignment.  *See* R. 22-1 at 2–3.  It asserts that "there is an absence of sufficient evidence to demonstrate that [Hunter Marine] knew or should have known that assigning Tindle to the M/V ELIZABETH ANN would expose him to an unreasonable risk of harm."  *Id.* at 3.  For example, Hunter Marine points out that Dr. Forman certified Tindle as fit for duty aboard a vessel such as the *M/V Elizabeth Ann*.  *See id.* at 2.  Instead

26

of responding to Hunter Marine's argument, Mrs. Tindle concedes that she is not pursuing a negligent assignment claim. *See* R. 29 at 4.

Having undertaken the requisite review of the record, *see Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992), the Court agrees with Hunter Marine. Even assuming Mrs. Tindle asserted a negligent assignment claim, there is insufficient evidence to show that Hunter Marine knew or should have known that Tindle was ill-suited to work aboard the *M/V Elizabeth Ann*. Accordingly, Hunter Marine is entitled to summary judgment on a negligent assignment theory of liability. *See Champ*, 2014 WL 2879152, at *26–27.

## C.

Finally, Hunter Marine moves for summary judgment on the categories of damages that Mrs. Tindle may recover. R. 19 at 1. Specifically, Hunter Marine argues that various nonpecuniary losses—including loss of society, companionship, guidance, loss of decedent's earnings and earning capacity, and punitive damages—are not recoverable under the Jones Act or general maritime law. R. 19-1 at 2–4 (Memorandum in Support of Motion for Partial Summary Judgment on Damages). Apparently conceding the point, Mrs. Tindle responds that she will "not seek such damages." R. 30 at 1.

Having undertaken the requisite review of the record and applicable law, *see Guarino*, 980 F.2d at 410, the Court agrees with Hunter Marine's argument (and accepts Mrs. Tindle's concession). The Court has held on more than one occasion that nonpecuniary damages are not recoverable under either a Jones Act negligence theory or a general maritime law unseaworthiness theory. *See Butler v. Ingram Barge Co.*, No.

27

5:14-CV-00160-TBR, 2015 WL 1517438, at *2–3 (W.D. Ky. Apr. 1, 2015); *Champ*, 2014 WL 2879152, at *14–22; *Billingsley v. Alberici Constructors, Inc.*, No. 5:13-CV-00084-TBR, 2014 WL 1248019, at *2–4 (W.D. Ky. Mar. 25, 2014); *accord Miles v. Apex Marine Corp.*, 498 U.S. 19, 31–36 (1989); *Szymanski v. Columbia Transp. Co.*, 154 F.3d 591, 595–97 (6th Cir. 1998) (en banc).  On this point, Hunter Marine is entitled to judgment as a matter of law.

## IV.

For the aforementioned reasons, and being otherwise sufficiently advised, **IT IS HEREBY ORDERED**:

1.     That Defendant Hunter Marine Transport, Inc.'s Motion for Partial Summary Judgment (R. 19) is **GRANTED**;

2.     That Plaintiff Donna Tindle's Motion to Strike Opinions of Defendant's Proposed Expert, William M. Beacom (R. 20) is **GRANTED IN PART** and **DENIED IN PART**;

3.     That Defendant Hunter Marine Transport, Inc.'s Motion to Exclude Certain Opinions of Dr. Joseph Varon (R. 21) is **GRANTED IN PART** and **DENIED IN PART**;

4.     That Defendant Hunter Marine Transport, Inc.'s Motion for Partial Summary Judgment on Particular Negligence Theories (R. 22) is **GRANTED IN PART** and **DENIED IN PART**;

5.     That Defendant Hunter Marine Transport, Inc.'s Motion to Exclude Certain Opinions of Pat Jamison (R. 23) is **GRANTED IN PART** and **DENIED IN PART**;

6.    That Plaintiff Donna Tindle's Motion to File Sur-Reply Regarding Defendant's Motion for Partial Summary Judgment on Particular Negligence Theories (R. 37) is **DENIED**; and,

7.    That Plaintiff Donna Tindle's Motion for Telephonic Oral Argument on Defendant's Motion for Partial Summary Judgment on Particular Negligence Theories (R. 38) is **DENIED**.

**IT IS SO ORDERED.**

Date:

cc:    Counsel of Record