# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CIVIL ACTION NO. 5:14-CV-00110-TBR-LLK

DONNA TINDLE, as administrator of the
Estate of Jimmie W. Tindle,                                                             Plaintiff,

v.

HUNTER MARINE TRANSPORT, INC.,                                                Defendant.

## MEMORANDUM OPINION AND ORDER

Donna Tindle filed this wrongful death action as the administrator of her late-husband Jimmie W. Tindle's estate. She alleges that Hunter Marine Transport, Inc. unreasonably delayed evacuating Tindle from the *M/V Elizabeth Ann* after he complained of difficulty breathing and so breached its duty to provide prompt and adequate medical care under the Jones Act and general maritime law. With discovery at a close, Mrs. Tindle asks the Court to exclude a handful of opinions offered by Hunter Marine's medical expert, Dr. Julie A. Bastarache. For the reasons discussed below, Mrs. Tindle's Motion to Strike, R. 49, is **GRANTED IN PART** and **DENIED IN PART**.

### I.

### A.

The general facts of this case are described in the Court's prior opinion, *Tindle v. Hunter Marine Transport, Inc.*, No. 5:14-CV-00110-TBR-LLK, 2016 WL 270481, at *1–4 (W.D. Ky. Jan. 21, 2016). Briefly, Jimmie W. Tindle worked as an engineer with Hunter Marine Transport, Inc. until his tragic death aboard the *M/V Elizabeth Ann* on April 25, 2014. *Id.* at *1. Around 4:07 p.m. that afternoon, Tindle called deckhand Kaleb "Tiny" Kline. *Id.* at *3. Sounding distressed, Tindle said: "Tiny, something's

1

wrong. Come up here." *Id.* (quoting R. 21-11 at 11–12 (Kline's Deposition)). Along with fellow deckhand Jonathan Welker, Kline went straight to Tindle's room. *Id.* The pair found Tindle "standing at his window breathing heavily." *Id.* (quoting R. 21-11 at 12–13). Kline told Welker "to go alert the wheelhouse." *Id.* (quoting R. 21-11 at 13). After a few minutes, Tindle passed out in Kline's arms. *Id.* Meanwhile, another deckhand woke Captain Milam and "told him that [Tindle] needed his help"; Captain Milam rushed to Tindle's room. *Id.* (quoting R. 21-6 at 45 (Milam's Deposition)).

Captain Milam found Tindle unconscious with Kline tending to him. *Id.* According to Captain Milam, Tindle had a pulse. *Id.* Within a few short moments, Welker returned along with crewmember Ben Vernon. *Id.* Either Kline or Captain Milam instructed Welker or Vernon to get an Automated External Defibrillator. *Id.* As Captain Milam left to call 911, he passed a crewmember carrying an AED to Tindle's room. *Id.* The crew removed Tindle's shirt and attempted to connect the AED to Tindle. *Id.* Kline testified that, just prior to this point, Tindle was gasping for breath but still breathing. *Id.* at 18.

Captain Milam placed his call to the Trigg County Emergency Medical Services Department at 4:13 p.m., and then instructed Robert Patterson to maneuver the *M/V Elizabeth Ann* to a nearby boat ramp at Linton, Kentucky. *Id.* Dispatch alerted Emergency Medical Technicians Emily Mayfield and Tim McGar, who were approximately nineteen miles away, at 4:15 p.m. *Id.* While en route, dispatch notified Mayfield and McGar that Tindle would be brought to the ramp via johnboat. *Id.* Mayfield and McGar arrived at the ramp at 4:35 p.m., but no one from the *M/V Elizabeth Ann* had yet landed. *Id.* Mayfield notified dispatch, and dispatch again told them "that

someone would be bringing the patient on a boat." *Id.* (quoting R. 21-12 at 9 (Mayfield's Deposition)). Shortly after, the johnboat arrived, but Tindle wasn't aboard. *Id.*

All told, it took thirteen minutes for Mayfield and McGar to load the necessary equipment on the johnboat and reach Tindle aboard the *M/V Elizabeth Ann*. *Id.* at *4. Sometime during that thirteen minute period, the crew of the *M/V Elizabeth Ann* radioed the johnboat and indicated that Kline and Vernon had started to attempt cardiopulmonary resuscitation. *Id.* Mayfield and McGar boarded the *M/V Elizabeth Ann* and began lifesaving efforts at 4:48 p.m. *Id.* Tragically, neither was able to ever detect a pulse. *Id.* Both ceased all lifesaving efforts at 5:16 p.m. *Id.*

### B.

On June 2, 2014, Donna Tindle filed this wrongful death action as the administrator of her late-husband's estate asserting claims under the Jones Act and general maritime law. *See* R. 1 at 2, ¶ 3 (Complaint). Following the close of discovery, the Court set a trial date of March 7, 2016. *See* R. 44 at 2, ¶ 4 (Amended Scheduling Order). Shortly before trial, however, Hunter Marine's medical expert, Dr. Arthur P. Wheeler, passed away, and so Hunter Marine asked the Court for a continuance and for leave to designate a new expert witness. *See* R. 47 at 2 (Motion for Continuance and Leave to Designate New Expert Witness). After holding a telephonic hearing, the Court granted that request. *See* R. 48 at 1, ¶¶ 1–2 (Order of February 1, 2016). Now, Mrs. Tindle asks the Court to exclude a handful of opinions offered by Hunter Marine's newly retained medical expert, Dr. Julie A. Bastarache. *See* R. 49 at 1 (Motion to Strike Dr. Bastarache's Opinions).

### II.

When a party challenges an opponent's expert witness, this Court must assume "a gatekeeping role" to ensure the reliability and relevance of the expert's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to nonscientific expert testimony). Federal Rule of Evidence 702 guides the Court through this inquiry. The plain language of Rule 702 says, first, that an expert must be qualified to testify on account of his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015). The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). A qualified expert may then testify so long as his opinions will aid the factfinder and are reliable, meaning the opinions are based on sufficient data, reliable methods, and the facts of the case. Fed. R. Evid. 702(a)–(d); *see also Clark v. W & M Kraft, Inc.*, 476 F. App'x 612, 616 (6th Cir. 2012); *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 854 (E.D. Ky. 2013).

There are a number of factors typically considered to resolve questions concerning the reliability (and admissibility) of expert testimony, but no list is exhaustive. *See Daubert*, 509 U.S. at 593–94; *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Powell v. Tosh*, 942 F. Supp. 2d 678, 686–88 (W.D. Ky. 2013). In any case, the Court has considerable leeway over where to draw the line. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) ("[W]here one person sees speculation, we acknowledge, another may see knowledge,

4

which is why the district court enjoys broad discretion over where to draw the line." (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997))). The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

### III.

Mrs. Tindle seeks to exclude most of the opinions offered by Dr. Bastarache.[1] *See* R. 49 at 1. Her objections fall into two broad categories. First, Mrs. Tindle finds four of Dr. Bastarache's opinions objectionable insofar as her report allegedly runs afoul of the Court's verbal directive during a prior telephonic hearing. *See* R. 49-1 at 1–5 (Memorandum in Support of Motion to Strike). Second, and in the alternative, Mrs. Tindle challenges three of those opinions as speculative, unreliable, outside Dr. Bastarache's field of expertise, or lacking a sufficient factual basis. *See id.* at 2–5. The Court will address each category in turn.

### A.

To start, Mrs. Tindle seeks to exclude four of Dr. Bastarache's opinions based on her understanding of this Court's instructions during the telephonic hearing on Hunter Marine's motion for leave to designate a new medical expert. *See id.* at 1–5. While the Court granted that motion, *see* R. 48 at 1 (Order of February 1, 2016), Mrs. Tindle insists it came with a price: "[T]he opinions of any newly retained medical expert could not go beyond those opinions previously offered by Dr. Wheeler." R. 49-1 at 1. Hunter Marine agrees an exchange took place, but understood the Court's remarks to mean that any

---

[1] There is no dispute regarding Dr. Bastarache's qualifications to offer medical opinions in this action. *See* R. 49-2 at 1 (Dr. Bastarache's Report) (summarizing Dr. Bastarache's professional experience).

5

newly designated expert could not offer opinions "significantly or substantially different from or beyond . . . Dr. Wheeler's opinions." R. 50 at 2 (Response to Motion to Strike).

The Court finds Hunter Marine's summation more accurate. Dr. Bastarache need not recite Dr. Wheeler's report verbatim. *Cf. Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("[Federal Rule of Civil Procedure 26(a)(2)(B)] does not limit an expert's testimony simply to reading his report. . . . [Instead, it] contemplates that the expert will supplement, elaborate upon, explain, and subject himself to cross-examination upon his report."). Having reviewed Dr. Wheeler and Dr. Bastarache's reports, there is no difference so significant or so substantial as to warrant excluding the latter. *Compare* R. 49-2 at 3–4, ¶¶ 1, 4, 6–7 (Dr. Bastarache's Report), *with* R. 49-3 at 1–3 (Dr. Wheeler's Report). Accordingly, the Court declines to strike Dr. Bastarache's report on that basis.

**B.**

In the alternative, Mrs. Tindle labels three of Dr. Bastarache's opinions as either speculative, unreliable, outside Dr. Bastarache's field of expertise, or lacking a sufficient factual basis. *See* R. 49-1 at 2–5.

**1.**

First, Mrs. Tindle objects to Dr. Bastarache's statement—that "it is possible that even had [Tindle] made it to the emergency room, he may have still died from this asthma attack"—as too uncertain to qualify as a medical opinion. *Id.* at 2 (quoting R. 49-2 at 3, ¶ 1). According to Mrs. Tindle, "a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages." *Id.* at 2–3 (quoting *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990)). Since Dr.

6

Bastarache articulated her opinion as nothing more than a "possibility," Mrs. Tindle submits that it must be excluded. *Id.*

The Court is not so sure. Unlike Mrs. Tindle's expert witness, Dr. Bastarache does not propose to *establish* an independent theory of causation. (If that were true, then *Mayhew* would control.) Instead, Dr. Bastarache offers an opinion to *controvert* Mrs. Tindle's causal theory. *See* R. 50 at 5–6. The difference is important: In the latter case, an expert need not state her opinion in terms of "probability," so long as the testimony is otherwise plausible. *See, e.g.*, *Wilder v. Eberhart*, 977 F.2d 673, 676–677 & n.2 (1st Cir. 1992); *Williams v. Eighth Judicial Dist. Court of State of Nev., ex rel. Cty. of Clark*, 262 P.3d 360, 368–69 (Nev. 2011). The Court finds it to be just that. Because Mrs. Tindle does not suggest why Dr. Bastarache's opinion is otherwise unreliable, the Court will not preclude her from offering testimony on this point.

### 2.

#### a.

Next, Mrs. Tindle takes issue with Dr. Bastarache's opinion that cardiopulmonary resuscitation "could [not] have been performed" effectively had the crew placed Tindle in "a smaller boat." R. 49-1 at 3 (quoting R. 49-2 at 3, ¶ 4). Mrs. Tindle argues that the "feasibility of performing" cardiopulmonary resuscitation on a johnboat falls outside of Dr. Bastarache's field of expertise. *Id.* at 4. Hunter Marnie does not appear to address that objection. *See* R. 50 at 6–8.

Still, Mrs. Tindle's point is persuasive. In an earlier opinion, this Court barred Mrs. Tindle's expert from opining on "the feasibility of removing Tindle from the *M/V Elizabeth Ann*" because he (as a medical doctor) lacked the necessary qualifications to do

7

so. *Tindle*, 2016 WL 270481, at *6 (citing *Champ v. Marquette Transp. Co.*, No. 5:12-CV-00084-TBR, 2014 WL 2879152, at *6 (W.D. Ky. June 24, 2014)). Taking that as true, it seems natural that the feasibility of performing cardiopulmonary resuscitation on a johnboat is not part of Dr. Bastarache's field of expertise either. The Court finds Dr. Bastarache to be unqualified to offer expert testimony on this subject.

### b.

In addition, Mrs. Tindle challenges Dr. Bastarache's conclusion that stopping cardiopulmonary resuscitation to transport Tindle off of the *M/V Elizabeth Ann* and onto a johnboat "would not have been a wise decision." R. 49-1 at 4 (quoting R. 49-2 at 3, ¶ 4). According to Mrs. Tindle, Dr. Bastarache's testimony lacks an evidentiary basis and proper foundation because the crew only started cardiopulmonary resuscitation *after* the johnboat had retrieved the emergency medical technicians—not *before*. *Id.* Hunter Marine is silent on that point. *See* R. 50 at 6–8.

Having examined the record, the Court is unable to discern any factual basis for Dr. Bastarache's testimony. Dr. Bastarache opines that the crew would have needed to stop performing cardiopulmonary resuscitation had Tindle been transported to shore via johnboat. *See* R. 49-2 at 3, ¶ 4. To arrive at that conclusion, she assumes that the crew had been performing cardiopulmonary resuscitation *before* launching the johnboat to retrieve Mayfield and McGar. *See id.* Yet, it seems as if the crew first started performing cardiopulmonary resuscitation well *after* the johnboat had been launched. *See* R. 27-11 at 13–14. Neither Hunter Marine nor Dr. Bastarache point to any conflicting evidence in the record. Consequently, the Court will exclude Dr. Bastarache's opinion because it rests on an insufficient factual foundation.

8

**3.**

Lastly, Mrs. Tindle says Dr. Bastarache's opinion—that "Hunter Marine was under no obligation to disclose Mr. Tindle's medical condition to anyone employed by Hunter Marine"—goes far beyond her area of expertise as a medical doctor. R. 49-1 at 5 (quoting R. 49-2 at 4, ¶ 7). On that point, Mrs. Tindle is right. While Dr. Bastarache may "explain why, from a medical doctor's perspective, unauthorized dissemination of personal medical information [might] 'violate medical standards,'" R. 50 at 9, she may not opine about the standard of care to which the law holds a reasonably prudent maritime outfit. Opinions on those matters should be left to a maritime expert—something, Dr. Bastarache must concede, she isn't. *See Tindle*, 2016 WL 270481, at *5. Accordingly, the Court finds Dr. Bastarache to be unqualified to offer expert testimony as to Hunter Marine's obligation to disclose Tindle's medical condition.

**IV.**

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Strike Opinions of Defendant's Newly-Retained Medical Expert, Julie A. Bastarache, M.D., R. 49, is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

Date:

cc:     Counsel of Record

9